PHILIP CHERRY AND RUTH CHERRY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cherry v. Commissioner
Docket No. 11462-79.
United States Tax Court
T.C. Memo 1982-579; 1982 Tax Ct. Memo LEXIS 172; 44 T.C.M. (CCH) 1316; T.C.M. (RIA) 82579; September 30, 1982. Richard B. Sherman and Arthur Pelikow, for the petitioners. Julius Jove, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge:* Respondent determined a deficiency of $200 in petitioners' Federal income tax for the year 1976. After concessions by the parties the sole issue for our decision is whether petitioners are entitled to a home office deduction under section 280A, I.R.C. 1954. FINDINGS OF FACTS Some of the facts have been stipulated and are so found. The stipulation *174 of facts and exhibits attached thereto are incorporated herein by this reference. Philip Cherry (petitioner) and Ruth Cherry, husband and wife, resided in New York City, New York at the time they filed their petition herein. Their Federal income tax return for 1976 was filed with the Brookhaven Service Center at Holtsville, New York. During taxable year 1976, petitioner was a concert cellist with the Metropolitan Opera Association, Inc. (hereinafter Met) at Lincoln Center, New York City, New York. As of 1976, petitioner had been a concert cellist for approximately 30 years and had been with the Met for 15 of the 30 years. Petitioner, as a member of the Metropolitan Opera Orchestra, [1] was covered by the terms of union contracts between Local 802, American Federation of Musicians (of which petitioner was a member) and the Met. During 1976 he received compensation from the Met in the amount of $22,510.23. He was compensated by the Met for the following periods: (a) three continuous pre-season rehearsal weeks; (b) the regular New York season whose duration was for no less than 27 weeks; (c) *175 49 tour days (of approximately seven weeks); (d) two weeks of performances in the New York City parks; (e) five weeks' vacation; and (f) five weeks' supplemental unemployment benefits. During the pre-season rehearsal period, the musicians would rehearse twice a day. The first rehearsal would begin at 10:30 a.m. and end at 1:15 p.m. and the second would begin at 2:00 p.m. and end at 4:45 p.m. This rehearsal schedule continued for 3 weeks, 5 days a week. During the New York season, petitioner was required to perform five operatic performances per week. The running time for each performance could vary from 1 hour 36 minutes to 4 hours and 55 minutes. Almost all performances during the New York season began at 8:00 p.m. and, depending upon the opera, ended at around 11:00 p.m. Saturday performances began at about 2:00 p.m. There was no contractual requirement that the musicians arrive prior to the start of the performances. However, most did so as to "warm up or tune up." Performances consumed 15 to 16 hours per week. All New York City performances (other than those in the parks) were at Lincoln Center. In addition to performing, during the New York season the orchestra *176 musicians were required to rehearse together as a unit. As a member of the string section, petitioner was required to participate in these rehearsals at the Metropolitan Opera House at Lincoln Center approximately 10 or 11 hours per week. The orchestra rehearsals were either at a rehearsal room in C level or "in the pit," where performances took place. Thus, during the New York season a member of the string section would spend approximately 26 hours per week at the Met facility at Lincoln Center playing and rehearsing. In addition, the three weeks of pre-season rehearsals, also at Lincoln Center, consumed about 27 1/2 hours per week. During the 49 tour days in 1976, the Met orchestra performed in Boston, Cleveland, Savannah, Memphis, Dallas, Minneapolis and Detroit. While on tour, the musicians generally did not rehearse together as a unit. The orchestra performed at night only and during the day the musicians were free to spend their time as they wished. Immediately following 2 weeks of performances in the park, the musicians received a 5-week paid vacation. During this period, the musicians were not obligated in any way to the Met and were again totally free to do as they *177 wished, including accepting independent employment, without any effect on their compensation. This contrasted with the supplemental unemployment benefits period during which time if a musician worked independently, the supplemental unemployment benefits to be received as compensation would be reduced. During the summer of 1976, petitioner performed for a period of 20 days for Festival Casals, Inc. in San Juan, Puerto Rico, and received $1,242 for his services there as a concert cellist. As a professional musician, petitioner was required to practice numerous hours in order to maintain, refine, and perfect his skill. Petitioner practices the opera in current production as well as the one in preparation. He would begin his individual practice with scales and warm-up exercises. He would spend considerable time on difficult technical passages, practicing those passages of the opera over and over. Practices at the Met were of the entire 93-piece orchestra, differing from a performance principally due to the absence of an audience. Petitioner's parts had to be perfected prior to a rehearsal or performance, since every error can be detected by his colleagues and his conductor. An *178 error can distract other members of the orchestra, and has the potential to disrupt the entire orchestra. The Metropolitan Opera House at Lincoln Center does not have private studios for practice on an individual basis by the 93 members of the orchestra. Neither did the Met otherwise provide to petitioner a facility for private practice. Orchestra employees were expected to practice individually off the premises, which practice was necessary as a practical matter in order for petitioner to carry out his obligations to the Met. Such off-premises practice, while a practical necessity for the orchestra employees, was not requested by the employer and was not a requirement or condition of employment. The musicians (including petitioner) were not required to report to the Met on their practice at home. By contrast, missing a rehearsal or a performance was investigated and usually would result in a loss of pay unless there was a legitimate reason for the absence. In the year in question, 1976, petitioner lived with his wife and two children in a seven room apartment in New York City. [2] One room was set aside for his exclusive use as his studio. The room or studio was furnished *179 with a desk, a chair, a stereo, recording equipment, and bookshelves holding hundreds of records and tapes and numerous books. The children were given strict orders to stay out of this room and, in addition to the aforementioned items, petitioner kept his cello there. The entire family viewed this room as a place solely for petitioner's business and neither social functions nor activities such as reading the paper or writing checks occurred there. Petitioner used the studio for approximately 31-33 hours per week while in New York and his work there included practice of his musical skills, review of musical scores, and rehearsal of his numerous operatic numbers. Petitioner deducted $675 for "studio rent and maintenance" on the joint 1976 income tax return. This amount was computed by taking one seventh of the total of the apartment rent ($3,695), electricity costs ($241) and household maintenance ($800). OPINION Section 280A limits the deductions for expenses in the home for taxable years beginning after December 31, 1975. [3]Section 280A(a) provides generally that "no deduction * * * *180 shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." [4]Section 280A(c)(1), as recently amended, sets forth an exception to this general disallowance [5] by providing that: (1) Certain business use.--Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis-- (A) [as] the principal place of business for any trade or business of the taxpayer, [6]
*181 (B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or (C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business. In the case of an employee, the preceding sentence shall apply only if the exclusive use referred to in the preceding sentence is for the convenience of his employer. However, for a use described in section 280A(c)(1) a limitation on the deductions is set forth in section 280A(c)(5) which provides that: * * * deductions allowed under this chapter for the taxable year by reason of being attributed to such use shall not exceed the excess of-- (A) the gross income derived from such use for the taxable year, over (B) the deductions allocable to such use which are allowable under this chapter for the taxable year whether or not such unit (or portion thereof) was so used. Respondent contends that petitioner has failed to show that he has satisfied one of the three prongs of section 280A(c)(1); that is, he failed to show that his studio was his principal place of business, *182 that his studio was a place of business used by patients, clients or customers in meeting with petitioner in the normal course of his trade or business or that his studio was a separate structure not attached to the dwelling unit used in connection with his trade or business. In addition, respondent contends that petitioner has failed to show that he "satisfied the requirements of section 280A(c)(5)". Petitioner contends that his studio was his principal place of business thereby satisfying section 280A(c)(1)(A), the first prong of section 280A(c)(1), and that he is not limited by section 280A(c)(5) since the gross income derived from the business use of his principal place of business far exceeds the deductions attributable thereto. Petitioner was a concert musician during the taxable year 1976. In addition to performing with the Metropolitan Opera at Lincoln Center, the New York City parks, and the various cities the Metropolitan performed at while on tour, petitioner performed in San Juan, Puerto Rico. During 1976 petitioner spent the greater portion of his time rehearsing, practicing, and reviewing in his efforts to maintain, refine, and perfect his skill. Petitioner contends *183 that his principal place of business was the place where he conducted his continuous and unceasing work at his trade or business, the trade or business of a professional musician, and that the Lincoln Center, and the facilities in San Juan and the tour cities were simply one of the places where the fruits of his work surfaced. This case is in all essentials similar to and controlled by Drucker v. Commissioner, 79 T.C.     (September 30, 1982). Drucker involved a professional musician who also played in the Met orchestra pursuant to the same contract governing petitioner. In Drucker, a Court reviewed opinion, we held that the petitioner therein was an employee of the Met, and that he was in the trade or business of being an employee of the Met. Accordingly, following the test articulated in Baie v. Commissioner,74 T.C. 105 (1980), we there held that the Lincoln Center was the "focal point" of petitioner's trade or business as an employee of the Met. The issues presented in this case are fully discussed in the majority and dissenting opinion in Drucker, and no purpose would be served by repeating them here. On the authority of Drucker *184 v. Commissioner,supra, we decide this issue for respondent. Decision will be entered for the respondent.
Footnotes
*. This case was tried before Judge Sheldon V. Ekman who is now deceased. By order of the Chief Judge it was assigned to Judge Richard C. Wilbur↩ for disposition.
1. The Metropolitan Opera Orchestra consisted of 93 regular musicians.↩
2. Other rooms included three bedrooms, a living and dining room and a kitchen.↩
3. Sec. 601, Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1569-1572. ↩
4. Sec. 280A(b)↩ provides that "subsection (a) shall not apply to any deduction allowable to the taxpayer without regard to its connection with his trade or business (or with his income producing activity)." 5. Other exceptions to the general disallowance provision of sec. 280A(a) are set forth in sec. 280A(c)(2), (3), and (4)↩.
6. As we recently said in Green v. Commissioner,78 T.C. 428, 431, n. 3 (1982), "Sec. 280A↩ was amended by Pub. L. 97-119, as signed into law Dec. 29, 1981. Prior to amendment, subsec. (c)(1)(A) read '(A) as the taxpayer's principal place of business.' This amendment applies retroactively to the tax years beginning after Dec. 31, 1975, except that, for tax years after Dec. 31, 1975, and before Jan. 1, 1980, the amendment applies 'only to taxable years for which, on the date of the enactment of this Act, the making of a refund, or the assessment of a deficiency, was not barred by law or any rule of law.'Sec. 113(e)."